## Stamper v. McCally.

February 24, 1950.

As Modified on Denial of Rehearing

May 5, 1950.

Jim Sowards, Judge.

Weldon Shouse, Charles H. Riedinger and Norman W. Bowman for appellant.

Harvey Parker, Jr., Simeon Willis, and Charles Russell for appellee.

CLAY, COMMISSIONER—Reversing in part, affirming in part.

In this malicious prosecution suit, appellee recovered $450 compensatory and $2050 punitive damages. Several grounds are urged for reversal, the principal one being that appellant was entitled to a directed verdict.

Appellant was 70 years of age, and had been a responsible merchant in Vanceburg for many years. He at one time owned ten $500 notes secured by a mortgage on a farm purchased by appellee. For several years appellee had made payments on the principal and interest. The evidence fails to indicate there was anything but friendly relations between appellant and appellee until the event which gave rise to this action.

On Saturday, February 7, 1948, appellee's husband Carl asked appellant about the balance due on the notes, and appellant says he agreed to check into his papers and render an accounting the following week. There is some dispute about the exact statement made at the time by appellant. The following Monday morning appellee called on him and stated she wanted to see the credits that had been given her on the notes. Appellant took his papers from his safe and appellee said: "Now, Jack, you have lied to Carl about whats been paid on the place and I want it straightened up."

The testimony of the parties concerning what happened immediately thereafter is conflicting. Appellee's version is: "* * * he said 'My word is just as good as yours up here in this Court and I will fix you' and he said, 'I will call the law over here and tell them you held the store up.' I said I had papers in my purse and he said he didn't care what I had. He called Mr. Billman." Appellant's version is: "I keep a few notes in the safe in a folder and her notes were there. I never had put them in the bank. We got the notes out and they were kind of mixed up. We got the notes out and she looked through them. I had all kinds of confidence in her. She said 'I don't want these' and she found some more and said 'I will take care of these' and she began to back away. I thought something was going to happen and I said 'Myrtle, give me back those notes or I will call the law.' She backed toward the back door, if you know

how it's situated and I started to call the law. I left some of these notes on the desk and I got about half way up through the store and run back and got the notes. I thought she might take those too. I went back to get the law. I called for Mr. Billman.'' Appellant further stated: ''She had been at the stove as I went through. She was by the stove and she opened the stove and threw something in. It looked like notes to me.''

What happened thereafter is not in dispute. Mr. Billman, the Chief of Police, was called in, and soon there was present at the scene Police Judge Diamond and County Attorney Riedinger.

Appellant was excited. He insisted on having appellee searched, stating that she either had some of his notes on her person or had burned them up. He asked Mr. Riedinger what he should do, and he was advised that a warrant must be secured. Appellant signed the affidavit. The warrant was issued by the Police Judge, and appellee was searched. No notes were found on her. Some of the parties present stated there was a wad of what appeared to be burned papers in the stove. Throughout this scene appellee made no statement of any kind in her own defense or to explain what was an apparent mistake. She only said: ''Jack, you are getting yourself in deeper all the time.''

After the above incident appellee was twice indicted by the grand jury and was tried for the larceny of five notes. The case was permitted to go to the jury, and appellee was acquitted.

As we read the record, the five notes about which this controversy arose had been paid by appellee, and she had them at home or elsewhere. At least she would have had a right to have them in her possession. Accepting appellee's testimony on this point, the five paid notes had been delivered to her prior to the above described occurrence.

The evidence would support a conclusion that appellant had forgotten about these notes and made a mistake when he accused appellee of having picked them up while they were discussing the account. He became excited, but as testified by the other parties present, he was more excited than mad. He did not attempt to take matters into his own hands, but called in the authorities.

It is quite probable that had appellee made any attempt to explain her position and the nature of the papers which she possessed, the matter could have been settled without further difficulty. We do not say that appellee had a positive duty to make any denial or explanation, but her actions tended to fortify appellant's mistaken belief.

Appellant insists he was entitled to a directed verdict because he had probable cause for taking the steps he did. It is true the action of appellee in making no statement at the time of the incident was a factor which could be considered in determining probable cause. Also the indictment by the grand jury is an important element. However, his claim of "advice of counsel" cannot be accepted because the only advice given related to the necessity for a search warrant.

The ground of probable cause is weakened when we consider the important fact that, while appellant was pressing the prosecution, he knew, or certainly should have known, that appellee had not taken from him anything of value. His eventual admission that the five notes in controversy had been paid cut the ground from under his charges. Yet he persisted in continuing the prosecution. In view of this situation and appellee's testimony, an issue was presented for the jury. Appellant was not entitled to a directed verdict.

We believe the trial Court committed error, however, in authorizing the jury to award appellee punitive damages. In order to justify such an instruction, the evidence must show wilfullness, malice, and a wanton disregard for the rights of others. See Jefferson Dry Goods Co. et al. v. Stoess, 304 Ky. 73, 199 S. W. 2d 994. The most we can find in this record is that appellant made a very bad mistake, and appellee contributed to the continuance of the mistaken belief by her actions. There is no evidence of substance upon which a jury could reasonably base a finding that appellant's acts were committed from malicious motives and with wanton disregard of her rights.

On the whole case we deem it proper to finally terminate this action as was done in the Jefferson Dry Goods case just cited, by affirming the judgment to the extent it awards compensatory damages, and reversing it as to punitive damages.

624

Wherefore, the judgment is reversed insofar as it allows punitive damages, and is otherwise affirmed; and the cause is remanded with directions to enter a judgment accordingly.